**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| GLITCH PRODUCTIONS PTY LTD, | |
| Plaintiff, | Case No. 26-cv-05010 |
| v. | **Judge Virginia M. Kendall** |
| THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A," | **Magistrate Judge Beth W. Jantz** |
| Defendants. | |

## DECLARATION OF ANDREW MASTERSON

I, Andrew Masterson, declare and state as follows:

1. This declaration is based upon my personal knowledge of the facts stated herein or on the business records that were made at the time or in the regular course of business. If called as a witness, I could and would testify to the statements made herein.

2. I am currently retained by Glitch Productions Pty Ltd ("Glitch" or "Plaintiff") as a consultant. I am knowledgeable about, or have access to, business records concerning all aspects of the Glitch's brand protection operations including, but not limited to, its trademarks, copyrights, sales, online sales, advertising, marketing, media coverage, and associated international operations. I make this declaration from matters within my own knowledge save where otherwise stated.

3. Plaintiff, Glitch Productions Pty Ltd, was formed in 2017 and is an Australian web animation studio and entertainment production and distribution company specializing in the development, production, and distribution of entertainment content. Plaintiff has its principal place of business in Australia.

1

4. Plaintiff is an indie animation studio that does it all, from pre-production to post production, marketing to management. Plaintiff is known for sharing fun and whimsical stories that primarily appeal to teenagers and young adults. While lighthearted, these stories also respect the audience's ability to appreciate mature plots and complex themes. Plaintiff is also largely recognized for its dedication to creating these stories through 3D animation, an art style not typically associated with traditional animation. By its unique animation style and its approach to storytelling, Plaintiff has amassed over 8.5 million subscribers to its YouTube channel. Plaintiff's roster of properties includes famous web series such as The Amazing Digital Circus, Meta Runner, Sunset Paradise, SMG4, and the subject of this action, Murder Drones.

5. The Murder Drones brand is built on an ongoing web series, created by Liam Vickers, which is set on a post-apocalyptic exoplanet called Copper 9 owned by a mining corporation. After the core collapse of Copper 9, all biological life on the planet is wiped out. Copper 9 is then inherited by service robots that try to eke out a new civilization from the ruins of Copper 9 and killer robots that are programmed to destroy any robots not following company protocol. The story follows Uzi, a sardonic teen helper robot gone rogue who befriends N, an excitable optimistic Murder Drone sent to destroy her.

6. *Murder Drones* is one of Glitch's most popular shows. The pilot episode alone received 1 million views on the first day, and within a month received over 5 million views. *Murder Drones* was also nominated for the 2023 Webby Awards for Best Animated Video (Series

& Channels). Some of the characters and character names made famous by *Murder Drones* include, but are not limited to:[1]

| Cyn |  |

---

[1] The characters contained within the table are not an exhaustive list of the characters embodied in Glitch's copyrighted works. This table is included only to provide examples of the characters found on the infringing products offered for sale or sold by Defendants. Regardless of any changes in their design, each of these characters, among others contained within Glitch's copyrighted works, have always maintained their distinctive qualities and unique elements of expression.

| J |  |
|---|---|
| N | |

| Uzi |  |
| --- | --- |
| **V** | |

7. Since the release of the pilot, *Murder Drones* has amassed a large and dedicated fan base that aims to enjoy the dark and comedic story created by the pilot episode. Following the runaway success of the pilot episode, Vickers and Glitch have released subsequent episodes of the show.

8. Before Defendants' acts described herein, Glitch launched *Murder Drones* and its related line of products bearing its famous MURDER DRONES mark. Glitch has also registered a multitude of works related to the *Murder Drones* series and the characters embodied therein with the United States Copyright Office (the "MD Copyrighted Works"). The registrations include but are not limited to: "Murder Drones logo." (U.S. Copyright Registration No. VA0002392355), "Cyn." (U.S. Copyright Registration No. VA0002392949), "J." (US Copyright Registration No. VA0002392950), "N." (U.S. Copyright Registration No. VA0002392951), "Uzi" (U.S. Copyright Registration No. VA0002392952), and "V" (U.S. Copyright Registration No. VA0002392953) all issued by the Registrar of Copyrights on February 15, 2023.

9. The MD Copyrighted Works are registered with the United States Copyright Office. True and correct copies of the records from the U.S. Copyright Office website for the MD Copyrighted Works are attached hereto as **Exhibit 1**. The MD Copyrighted Works embody the distinctive characters found in paragraph 6 above. Since first publication, the MD Copyrighted Works have been used on Glitch's products and are featured on Glitch's official website, www.glitchproductions.store.

10. Glitch markets and sells a variety of Murder Drones branded products, including plushies, figurines, acrylic stands, keychains, notebooks, pens, posters, pins, clothing, and hats (collectively, "MD Products").

11. MD Products have become enormously popular and even iconic, driven by Glitch's quality standards and innovative designs. Among the purchasing public, MD Products are instantly recognizable as such. The Murder Drones brand has become a global success and MD Products are among the most recognizable in the world. MD Products are distributed and sold to consumers through Plaintiff's official website, www.glitchproductions.store.

12. Glitch has continuously used the MURDER DRONES trademarks, and other trademarks, and has continuously sold products under its MURDER DRONES trademarks (the "MD Trademarks"). As a result of this continuous use as well as the fame and popularity of *Murder Drones*, strong common law trademark rights have amassed in the MD Trademarks. Glitch's use of the marks has also built substantial goodwill in the MD Trademarks. The MD Trademarks are famous marks and valuable assets of Glitch. MD Products typically include the MD Trademarks and/or MD Copyrighted Works.

13. The MD Trademarks are registered with the United States Patent and Trademark Office. True and correct copies of the federal trademark registration certificates for the MD Trademarks are attached hereto as **Exhibit 2**. The MD Trademarks are valid, subsisting, and in full force and effect.

14. The MD Trademarks are exclusive to Glitch and are displayed extensively on MD Products and in marketing and promotional materials. The MD Trademarks are also distinctive when applied to MD Products, signifying to the purchaser that the products come from Glitch and are manufactured to Glitch's quality standards. Whether Glitch manufactures the products itself or contracts with others to do so, Glitch has ensured that its products bearing the MD Trademarks are manufactured to the highest quality standards.

15. The MD Trademarks are famous marks, as that term is used in 15 U.S.C. § 1125(c)(1) and have been continuously used and never abandoned. The innovative marketing and product designs of MD Products have enabled the Murder Drones brand to achieve widespread recognition and fame and have made the MD Trademarks some of the most well-known marks in the entertainment industry. The widespread fame, outstanding reputation, and significant goodwill associated with the Murder Drones brand have made the MD Trademarks valuable assets of Glitch.

16. Products bearing the MD Trademarks have been the subject of substantial and continuous marketing and promotion by Glitch. Glitch has and continues to market and promote the MD Trademarks in the industry and to consumers through the official Glitch website www.glitchproductions.store.

17. Glitch has expended substantial time, money, and other resources in advertising and promoting the MD Trademarks. Specifically, Glitch has expended substantial resources in advertising, promoting, and marketing featuring the MD Trademarks. MD Products have also been the subject of extensive unsolicited publicity resulting from their high-quality, innovative designs. As a result, products bearing the MD Trademarks are widely recognized and exclusively associated by consumers as being high-quality products sourced from Glitch. MD Products have become among the most popular of their kind in the world. The MD Trademarks have achieved tremendous fame and recognition, adding to the inherent distinctiveness of the marks. As such, the goodwill associated with the MD Trademarks is of immeasurable value to Glitch.

18. MD Products are sold only through authorized retail channels and are recognized by the public as being exclusively associated with the Murder Drones brand.

19. The success of the Murder Drones brand has resulted in significant counterfeiting of the MD Trademarks and infringement of the MD Copyrighted Works. Because of this, Glitch has implemented a brand protection program by investigating suspicious websites and online marketplace listings identified in proactive Internet sweeps. Recently, Glitch has identified many fully interactive e-commerce stores offering products using infringing and counterfeit versions of the MD Trademarks and/or unauthorized copies of the MD Copyrighted Works (collectively, the "Unauthorized Products") on online marketplace platforms like Amazon.com, Inc. ("Amazon"), Dhgate.com ("DHGate"), eBay, Inc. ("eBay"), Roadget Business PTE Ltd. ("SHEIN"), WhaleCo, Inc. ("Temu"), Walmart, Inc. ("Walmart"), and Context Logic, Inc. d/b/a Wish.com ("Wish"), including the e-commerce stores operating under the seller aliases identified in Schedule A to the operative complaint (the "Seller Aliases"). The Seller Aliases target consumers in this Judicial District and throughout the United States.

20. I perform, supervise, and/or direct investigations related to Internet-based infringement of the MD Trademarks and MD Copyrighted Works. Our investigation shows that Defendants are using the Seller Aliases to sell Unauthorized Products, from foreign jurisdictions to consumers in the U.S. and elsewhere. I, or someone working under my direction, analyzed each of the e-commerce stores operating under the Seller Aliases and determined that Unauthorized Products were being offered for sale to residents of the United States, including Illinois residents. This conclusion was reached through visual inspection of the products listed on each e-commerce store, the price at which the Unauthorized Products were offered for sale, other features commonly associated with e-commerce stores selling counterfeit or infringing products, and because Defendants and their e-commerce stores do

not conduct business with Glitch and do not have the right or authority to use the MD Trademarks or copy the MD Copyrighted Works for any reason. Additionally, each e-commerce store offered shipping to the United States, including Illinois. True and correct copies of screenshot printouts showing the active e-commerce stores operating under the Seller Aliases reviewed are attached as **Exhibit 3**.

21.     Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases; offer shipping to the United States, including Illinois; accept payment in U.S. dollars; and, on information and belief, sell Unauthorized Products to residents of Illinois.

22.     Defendants concurrently employ and benefit from similar advertising and marketing strategies. For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars via numerous methods, including credit cards, Amazon Pay, Stripe, and/or PayPal. E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer. Glitch has not licensed or authorized Defendants to use any of the MD Trademarks and/or to copy or distribute the MD Copyrighted Works, and none of the Defendants are authorized retailers of MD Products.

23.     Many Defendants also deceive unknowing consumers by using the MD Trademarks without authorization within the content, text, and/or meta tags of their e-commerce stores to attract consumers using search engines to find websites relevant to MD Products. Other

e-commerce stores operating under the Seller Aliases omit using the MD Trademarks in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for MD Products.

24. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

25. E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Unauthorized Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and the full scope and interworking of their operation, and to avoid being shut down.

26. Defendants are collectively causing harm to Glitch's goodwill and reputation because the effect of their unlawful actions taken together amplifies each harm and creates a single negative consumer impression. Defendants' activities, occurring at the same time and in the same retail space and manner as one another, blend together to create a single negative impression on consumers such that they constitute the same occurrence or series of occurrences. The combination of all Defendants engaging in the same illegal activity in the same time span causes collective harm to Glitch in a way that individual actions, occurring alone, might not.

27. E-commerce store operators like Defendants communicate with each other through QQ.com chat rooms and utilize websites, like sellerdefense.cn, that provide tactics for operating multiple online marketplace accounts and evading detection by brand owners.

Websites like sellerdefense.cn also tip off e-commerce store operators like Defendants of new intellectual property infringement lawsuits filed by brand owners, such as Glitch, and recommend that e-commerce operators cease their infringing activity, liquidate their associated financial accounts, and change the payment processors that they currently use to accept payments in their online stores.

28. Infringers, such as Defendants, typically operate under multiple seller aliases and payment accounts so that they can continue operation despite Glitch's enforcement. E-commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to off-shore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to Glitch.

29. Defendants are working to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Unauthorized Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Glitch, knowingly, and willfully used, and continue to use, the MD Trademarks and/or copies of the MD Copyrighted Works in connection with the advertisement, distribution, offering for sale, and/or sale of Unauthorized Products into the United States and Illinois over the Internet.

30. Monetary damages alone cannot adequately compensate Glitch for ongoing infringement because monetary damages fail to address the loss of control of and damage to Glitch's reputation and goodwill. Furthermore, monetary damages are difficult, if not impossible, to completely ascertain due to the inability to fully quantify the monetary damage caused to Glitch's reputation and goodwill by acts of infringement.

31.     Glitch's goodwill and reputation are irreparably damaged when the MD Trademarks are used in connection with the offering for sale or sale of goods not authorized, produced, or manufactured by Glitch. Glitch's goodwill and reputation are also irreparably damaged when the MD Copyrighted Works are reproduced, distributed, and displayed to the public without its permission. Moreover, consumer brand confidence is damaged, which can result in a loss of future sales and market share. The extent of harm to Glitch's reputation and goodwill and the possible diversion of customers due to loss in brand confidence are largely unquantifiable.

32.     Glitch is further irreparably harmed by the unauthorized use of the MD Trademarks and MD Copyrighted Works because counterfeiters and infringers take away Glitch's ability to control the nature and quality of the Unauthorized Products. Loss of quality control over goods offered for sale or sold under the MD Trademarks or that copy the MD Copyrighted Works and, in turn, loss of control over Glitch's reputation is neither calculable nor precisely compensable.

33.     The use of the MD Trademarks in connection with the offering for sale or sale of goods not authorized, produced, or manufactured by Glitch is likely causing and will continue to cause consumer confusion, which weakens Glitch's brand recognition and reputation. Consumers who mistakenly believe that the Unauthorized Products originate from Glitch will come to believe that Glitch offers low-quality products. Inferior quality products will result in increased skepticism and hesitance in consumers presented with MD Products, resulting in a loss or undermining of Glitch's reputation and goodwill. Indeed, there is damage to Glitch's reputation and goodwill even if a consumer knows that the goods he or she is purchasing are counterfeit. Prospective consumers who see Unauthorized Products

used by others may mistakenly believe such goods to be genuine and may consequently develop a poor impression of Glitch and its trademarks. Such post-sale confusion results in damage to Glitch's reputation and correlates to a loss of unquantifiable future sales.

34.     Glitch is further irreparably damaged due to a loss of exclusivity. MD Products are meant to be exclusive. Glitch's extensive marketing efforts and distribution of MD Products are aimed at growing and sustaining sales of MD Products. The MD Trademarks are distinctive and signify to consumers that the products originate from Glitch and are manufactured to Glitch's high-quality standards. When counterfeiters use the MD Trademarks to offer for sale or sell goods without Glitch's authorization, the exclusivity of MD Products, as well as Glitch's reputation, are damaged and eroded, resulting in a loss of unquantifiable future sales.

35.     Glitch will suffer immediate and irreparable injury, loss, or damage if an *ex parte* Temporary Restraining Order is not issued in accordance with Federal Rule of Civil Procedure 65(b)(1).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May _____12_____, 2026, at London, United Kingdom.

/s/ *Andrew Masterson*
Andrew Masterson

14